Good afternoon, Your Honor. Good afternoon. May it please the court. My name is Mark Nonabadi. I represent, don't worry, I get it all the time. Well, I'm terrible on names. Yeah, I represent Officer John Edwards and Officer LaShawn Turner in this appeal. Let me just acknowledge right off the bat that this is obviously a tragic case, any case that potentially involves the death of a citizen at the hands of the police or the MD. This case goes back to an incident that happened back on January 16 of 2018 when Officers Edwards and Turner were called to a mental health crisis at a lady by the name of Shauna Tunstall's house. Yes. Hi, counsel. You know what? I'm so, I am familiar and I'm guessing my colleagues are familiar with the facts here and you have so little time. Is it okay if I just start with a question? Yes, Your Honor. Okay, so I want to talk about the merits prong of qualified immunity for a minute and not the clearly established prong because we're on a motion to dismiss, right? There's been no discovery and the complaint alleges and the district court accepted these allegations as plausible after it reviewed the video that the plaintiff who committed no crime and was unarmed and was detained only for his own benefit was held on the ground for roughly six minutes, stomach down, hands cuffed behind him, face pushed into a pillow, defendants applying weight to his body, pushing down, continuing to do that as he's crying that he can't breathe and after he becomes totally unresponsive and that the officers at least have been specifically trained not to do this because of the precise risk that materialized here, which is that he suffocates to death, but you want us to hold that on a motion to dismiss with no discovery as a matter of law, it is impossible for that to add up to a use of excessive force? That's what we're asking. That's what we're asking, Your Honor. Yes, yes. Okay, and why would that be? Why would that be? So what makes the case a little bit different than some of the other cases is this is not a lot more about what happened on the evening of question, you know, as the courts probably well aware, you know, the officers now wear these body cams and we have video. No, no, but I'm right. And the district court said that the district court said, I understand if the video contradicts the allegations in the complaint, then I won't credit them. But what I just read you were the allegations that the district court did credit after watching the video. And on interlocutory review like this, we can't second guess the analysis of the video. So I don't think I've already accounted for the video, I think, and my question to you. Well, I mean, Your Honor, with all due respect, and I do think that the facts as set forth in the video, which really can't be disputed at this time, do not indicate that excessive force was used by either one of the officers or the EMTs at the time. I think there are a few things that the court pointed out in its findings of fact that I believe are relevant to the analysis and would allow this court to determine that there were no, there was no excessive force used on this particular evening. Some of the important facts I think that the district court judge Hudson pointed out were, this is not a situation where the officers came in and immediately took this gentleman down. He was counseled for about 20 minutes prior to the use of force about why they were there, why they needed to take him. They asked him many, many times to voluntarily go with them or the EMTs to the hospital. In this case, the decedent refused to do that. Once the decedent was taken down to the floor, there is not an allegation in the complaint, nor is there any evidence in the video that once he was taken to the ground that you have gratuitous force, like in many of the other cases where he's taken down, there's no tasing, there's no jumping on his back, there's no punching, there's no slamming his head into the ground. There's none of the things that you see in many of the other cases where the courts have found there may be excessive force when somebody's taken into custody. Here, once he is secured in handcuffs, all the force is removed from him. It's not until he then begins to resist again that the defendants or the appellants in this case put their hands on him in order to try to settle him down. They check on his air, his breathing, at least on three occasions over the approximately five minutes that he's down. They are talking to him about trying to settle down. They say, we're not trying to hurt you, please relax. Again, it's a very different case than many of the other excessive force cases that this court unfortunately has to deal with once a person is placed into custody. I think we have a situation, unlike many other cases, where the force applied is not continuous throughout, it's not gratuitous, it's not substantial or significant, the words the other courts use. I see I'm out of time, I apologize. I know my co-counsel are going to finish up the arguments, but I'm happy to stay on if you like. We can do it in advance. We'll hear from Mr. Weinberger, I'm not sure about you. This counts as my time, not your time, to try to speak slowly enough so that the court can ask its questions, because after the poll, we have to make the decision. You know the case already. Yes, I'm sorry. Mr. and Ms. Weinberger? It's Leslie Weinberger. May it please the court, I represent Christopher Tenley. The point that I would like to make in my small amount of time is that context matters, and it matters particularly in the case of qualified immunity. I know that this court is well-versed in qualified immunity, and it knows that it exists to protect people in these gray areas. I think one of the cases talked about the hazy borders, and mental illness often operates in that hazy border. It doesn't lend itself to an obvious response, and it makes the dynamic very unpredictable and fluid. By virtue of the mental illness, the person is not necessarily making rational decisions, or making decisions that are self-protective. That's what this case is here. It's not obvious. My client comes in at the request of law enforcement to help, and I think the question posed for the court is really, is there a clearly established body of law that put the defendants on notice that trying to subdue a mentally ill man with obvious self-inflicted injuries for less than five minutes, while he's also being monitored by EMTs, was a constitutional violation, and in particular... Dr. Stiles, can I go back? You started by saying that context matters, and I think that's clearly true, both for the merits analysis here and for clearly established, but that's why I think we have said that it's very hard to grant qualified immunity on a motion to really matter in these cases, both on the merits and also for trying to figure out whether a case is squarely governed by some other precedent. A motion to dismiss, we don't have the context yet, which is basically what the district court said. I feel like you guys did okay with this district court. It's a motion to dismiss. He did grant qualified immunity on some of the claims, and on just this one, he said, look, come back after summary judgment. I'm not saying we're done with this. I'm just saying I need a few more facts. Why isn't that right? We have said that it ought to be very hard to prevail on a motion to dismiss, just precisely for the reasons you've given. I would normally agree with your characterization, and the reason I wouldn't agree here is because we have the video. Again, can I ask you... This question, it's a jurisdictional question. The district court reviewed the video itself, and it said where the video contradicts the allegations, I'll go with the video, but it still found, having watched the video, no, it is entirely plausible to say he was sufficiently secured. There was no reason to keep applying force. My understanding is that on interlocutory review, whatever I might think of the video, we're stuck with the facts as the district court found them. The district court's view of the record, we have to take as a given, and he watched the video, and he just sees it differently than you guys do, and I don't know that we can get at that in this posture. Even if that's the case, I think this court can still get at it because it's not clearly established law, particularly as it applies to my client in EMT. All of the cases that have been by the plaintiff has dealt with law enforcement officers and what they've done in situations, and none of those situations have factual scenarios like the one we're dealing with here, and so I think that the court is not precluded from deciding that the law is not clearly show. And when you say there are no cases with facts like this, I assume you mean in the fourth circuit because there's a whole bunch of circuits that have looked at facts. Again, we don't know what the facts are, but given the limited basis of our knowledge, facts that look exactly like these facts, and they have all held, one, that's excessive force, and two, it's clearly established that that is excessive force. So you mean just in the fourth circuit, we haven't looked at anything just like this? Fourth circuit or in the Supreme Court. Now, I know the Supreme Court just came out with a case very recently, but of course, that wouldn't have been in play back in 2018. But in the fourth circuit, and I see I'm out of time. If you'd like me to finish. But in the fourth circuit, I don't think there's any cases that deal specifically with this kind of scenario. And that's the point is my client needs to be on notice of what the law is. Otherwise, and it's your understanding that that law has to come from the fourth circuit. It's not enough if there's a consensus in the other circuits. I just don't think that that law is binding on this court. For qualified immunity purposes, that is. We've said that anyway, if there's a consensus. You were talking about that case from the recent case from the Supreme Court, that was a couple weeks ago, was it? The Lombardo case? That's the name of it? I believe it was decided. Well, I just have it. It was decided in 2021. But yes, it was very recently, probably within the past month. There were a couple of them decided like two weeks ago without argument. I think maybe one of them is what you're talking about. Okay. Yes. And there were two others, Taliqua and Rivas-Villegas that were also decided. That was actually on October 18th. Mr. Conrad, do you have something for us? Yes, ma'am. Thank you. John Conrad. I represent the defendant, Alex Mays, who is also an EMT person, just like Ms. Winterberger's client. And I adopt her argument on behalf of Alex Mays. I heard what the court had to say, but the bottom line is that the complaint Exhibit C does contradict and refute a lot of the allegations in the complaint that the district court relied on. And we think that the district court erroneously relied on those allegations given the fact that we have a videotape showing all the facts of this case. But nevertheless, as with Tenley, with Mays, there is no clearly established law that gives a bright line test of warning either Mays or Tenley about what constitutes an unlawful unconstitutional act. Counsel, can I ask you just a factual question? And I will totally understand. I know there's been no discovery and maybe this question is premature and I will understand if that's the I was wondering, there's evidence attached to the complaint, I guess, that police officers are trained about the dangers of positional asphyxiation. Do EMTs, would EMTs have learned along the way that if you keep a person pushed down on their stomach with their hands behind their back for a prolonged period of time while they're saying they can't breathe, that that would create a risk of asphyxiation? I understand that we know that as to the police officers, but the record does not show one way or the other as to the EMTs. Do you have a feel for that or should I wait or do we just not know that because there's no discovery? I do not know the answer to that, but I will tell you that it's clear from, again, the allegations and the complaint Exhibit C that Mays as well as Tenley were, and this is admitted in the complaint, were assisting Officer Edwards who made the decisions on the, on the, not only the initial detention, but also the use of force after that. For example, Mays, the only thing he did, and both Mays and Tenley provided, you know, monitoring of Mr. Lawhorn during this whole episode and, as a matter of fact, on 10 different occasions Edwards as well as Mays and Tenley monitored Mr. Lawhorn's condition in terms of breathing and that sort of thing, but the bottom line is that, you know, positioning of Mr. Lawhorn was being provided by Officer Edwards and not by either Mays or Tenley. For example, Mays was on his feet the whole time and, you know, if Mays and Tenley are liable in this case, then any EMT that touches the person under this situation is going to be liable and it's going to turn the practice upside down. In Mays' case, he touched Mr. Lawhorn for a grand total of 99 seconds, over 3 minutes and 28 seconds, and that's depicted at the time marker 23 minutes to 26 minutes and 28 seconds on the video cam and it's not contradicted in the situation for Tenley. The time that these two men touched Lawhorn was minuscule. It was also proportional and it was reasonable and it was necessary because after Mr. Lawhorn was initially detained in this case, that occurred at the 22 minute 39 second mark to the 23 minute mark. Mays, Turner, and Tenley all stood up and walked away from Mr. Lawhorn. They had no intent whatsoever after he was initially detained by Officer Edwards to lay their hands on him and the only reason Mays, as well as Tenley, subsequently undertook any physical restraint was because of Mr. Lawhorn's active resistance. So that coupled with the fact that these two men had absolutely no bright line whatsoever to guide them, to indicate to them that they were guilty of any constitutional violations is dispositive. Well see that's why I asked about their training because we have held that you can look at things like training documents and policies under the qualified immunity analysis and it's one of the reasons I think it's hard to apply the clearly established analysis at this stage of the proceedings when there's been no discovery on any of that. Well if you read the allegations of the complaint and you look at complaint exhibit C, you'll see what I'm talking about is true and that is Tenley and Mays were role players and it wasn't part of their role, you know, for positioning of him in terms of the fixative. They followed the request of Edwards on that point and initiated nothing on their own because Mays had initially told Mr. Lawhorn as well as his roommate Ms. Tunstall that he had done, you know, a time preface and place initial evaluation of him and that he had concluded that he could not provide services to Mr. Lawhorn because he had not consented and he announced that conclusion to Mr. Lawhorn as well as his roommate Tunstall. Mr. Conrad, you've gone well over. You want to just ease up your rebuttal? If I may just add one last point. Well you're already used one minute and 22 seconds and you only have one minute of rebuttal. So do you want to continue and I'll waive my rebuttal if I can have 20 more seconds. The last thing I want to say is that but for the passionate request for detention by his roommate Ms. Tunstall, Mays, Tenley, none of these appellants would be here. Listen to the words of Mrs. Tunstall responding to Mays' conclusion that he couldn't transport Mr. Lawhorn. Hell no. Hell no. He needs to go out of here right now like he's behaving. I'm telling you please. Okay. I can't take care of that. Whatever that mind thing is, that mind thing is uncontrollable. If he ends up dead here tonight in this house, I did not do it and that's the point I'm advocating. His mental state. And that's at the minute marker 16, 53 second marker. All right. Thank you very much. Thank you for your courtesy, Your Honor. Mr. Mcbeth. May it please the court. Good afternoon. My name is Isaac Mcbeth. I'm here on behalf of Angie Lawhorn, the mother of Joshua Lawhorn. We are requesting that the court affirm the district court's denial of qualified immunity to these appellants as it concerns their excessive force after Mr. Lawhorn was secured in handcuffs. Being that this is an interlocutory appeal, what is not subject to review here is the factual determinations of the district court. The district court took as true the factual allegations in the complaint, tested against the video, and after doing that, arrived at the conclusion that the defendant's continued use of force, notwithstanding Mr. Lawhorn's alleged resistance, ran afoul of clearly established law and was excessive. And so to disrupt that result, there would have to be a error of law that is an error in the interpretation of the application of the facts to the law, not a misinterpretation of the video or the allegations in the complaint. And there's been no showing that the district court erred in that regard. Actually, the district court cited this circuit's precedent as it relates to the unwarranted application of gratuitous, unnecessary force to secured individuals in concluding that the complaint plausibly alleged a clearly established violation and also cited to the authority that has been promulgated by other circuits concurring on that issue in more factually specific contexts. And so in the absence of that error or in the absence of any showing that the district court erred in its legal application, we don't think that the appellants have met their burden of accountability. Now, as it concerns the merits of the excessive force analysis, here it's the complaint alleges that Mr. Lawhorn had committed no crime. It alleges that at the time that this force continued, he was secured in handcuffs and he was not a threat to officers and that he was not capable of flight or resistance. And under this that arrangement of the Graham factors yields the conclusion that the application of force, particularly force that is capable of causing severe injury or death, is excessive. And this court's precedents, such as Bailey v. Kennedy and Young v. Prince George County, established that the application of force to someone who has been secured, who has not committed a crime and is no longer a threat to officers, is unconstitutional. And what I think is notable about those precedents is in both of those cases, the gratuitous force that was held unconstitutional in no way posed risks of injury comparable to the use of force at issue in this case. So for example, in Bailey, the constitutionally offensive use of force was jerking the plaintiff up by the shoulder after he had been secured in handcuffs face down on the ground. It caused the plaintiff a severe shoulder injury. But compare that against the present use of force where the risk is asphyxiation and death. It just seems to me that if Bailey clearly established you couldn't use that lesser degree of force under analogous circumstances, it would be difficult to say it didn't clearly establish you could not use deadly force under analogous circumstances. And in that regard, I think that that is why the district court was correct in its analysis. For a second reason, which is this use of force violated the rule that deadly force may only be imminent harm to law enforcement officers or those that are nearby. And it has to be a imminent threat of serious harm. It can't be something like the sorts of harms that have been alluded to in briefs like flopping on the floor. And there's been no indication that such a harm exists. It's certainly not borne out by the allegations of the complaint. The district court did not find any indication that such a threat existed. But yet the decedent was exposed to the use of deadly force for almost six minutes. And he ultimately did die of his injuries as a consequence of that. And to quote this court's language from Clem B. Corbeau, the law in 1988, which obviously predates this, provided clear guidance to a police officer that he was not free to use deadly force in the circumstance where the recipient of the force posed no threat to officer safety. And here, Mr. LaHun was handcuffed. He was face down on the ground. There's simply no realistic argument to be made from that body of facts that he posed the threat needed to exert deadly force on him. Can I ask you a question just so I'm clear on Tennessee v. Garner meaning? I mean, we held in Armstrong something pretty similar, which was just because someone is resisting, that doesn't mean you can use force. There has to be a danger that you're addressing. So the fact that someone is struggling, if they can't actually do anything about it, does not by itself justify the use of force. So your argument here doesn't really depend on use of deadly force, given its sort of specialized doctrinal meaning, right? Like whether it's deadly force or not. Okay. Exactly right, Your Honor. And I think that that is actually one of the points that's made in the estate of Jones case is that this gratuitous force on a secured individual, whether deadly or not, would have run afoul of the facts at issue in this case. So it is not necessary to reach a finding of deadly force to still find a violation of clearly established law here. Let me look through my notes. The final point that, oh, I'm sorry. The final point that I would like to make on the issue of clearly established law deals with the exertion of force on an incapacitated subject. That was addressed in the estate of Jones case as well. And there, this court observed that in 2013, it would have been known to a reasonable law enforcement officer that you cannot continue to use force on an incapacitated subject. And here, the video exhibit to the complaint clearly bears out that Mr. LaHun was completely unresponsive at approximately the 27 minute mark, but yet the continued application of weight and pressure in the prone position continued for another minute and a half. And so that would be yet another basis in which this force was not only constitutionally excessive, but ran afoul of I want to answer any questions I can to be helpful to the court, if there are any. Well, can I ask you to address the EMTs for a minute? The district court didn't really treat them separately when it comes to the excessive force claim. But I mean, maybe you could just address the concern that I understand some of your colleagues to be raising, which is these are not law enforcement officers, they're paramedics, and they find themselves thrust into this law enforcement situation. And so why can't they just follow the officer's lead and assume the officers know the rules? Well, I think that the answer to the question, Your Honor, is that they can follow the law enforcement officer's lead, but that Virginia law has established that when you are the lawful extent of your authority is coextensive with that of the officer. That was decided by the Supreme Court in the Byrd decision. And so the law would have put the paramedics on notice or the you know, the objectively reasonable paramedic paramedic charged with knowledge of the law would have known that their conduct in that situation would have been measured against the same standards of conduct applicable to law enforcement officers, given this was a law enforcement arrest. And in fact, on that point, the ECO statute in Virginia, which Mr. Lehun was being taken into custody under specifically grants the authority to bring someone into custody solely to law enforcement officers. So again, someone aware of the law of the governing law of the jurisdiction would realize they were performing a law Mr. Lehun, and that would further put them on notice that they would be judged by law enforcement standards. Unless there's any other questions that I can field for the court, that concludes my argument. I don't hear any other questions. Thank you very much. Thank you, Your Honor. Thank you. Is there any rebuttal? Briefly, Your Honor. And I just want to point out a couple things. There was a there was a there was a question earlier. I think it was Judge Harris that asked, or maybe you asked, Your Honor, about precedent in other jurisdictions and whether that would give the guidance necessary to the defendants in this case to know that the conduct that's at issue would be a constitutional violation or clearly established constitutional violation. And I guess I would respectfully suggest that many of the other cases out there cited by everybody in this in this case, whether it's myself or the opponents where you're dealing with force applied after somebody's been brought into custody, is what I would categorize as much more gratuitous force than what you have here. Even the Jones case, the estate of Jones case, which Mr. McBeth just cited, I mean, I think after they had him down, they chased him four times, punched him in the face threw him down a set of stairs, placed him in a choke hold, and then shot him 22 times with a gun. I don't know that's the kind of fact pattern that would put these particular defendants on notice of what they did here was a clear constitutional violation. It seems to me if we're going to look to other jurisdictions, the Seventh Circuit opinion in the state of Phillips is almost on all fours with this. And in that case, the court said it was not a constitutional violation to do almost exactly what the defendants in this particular case did. So I would respectfully suggest that whether you're looking at the Fourth Circuit jurisprudence or jurisprudence from your sister circuits, I think it's hard to find a case that's on all fours that would allow any one of these particular defendants to know that this particular conduct, particularly given the attempt to monitor his behavior, particularly given the fact that the decedent in this case placed himself into this position, particularly given that we're talking about maybe five minutes, particularly that there's no gratuitous force. I don't believe there's any clear case law out there would have allowed any of these defendants to know that these series of acts or omissions would constitute a constitutional or state law violation. Thank you very much. Thank you. And counsel, do you have a rebuttal, Ms. Weinberger? Yes, I do. I just wanted to briefly talk about the Bird case that Mr. McBeth had mentioned. That case was a case where a citizen was asked to effect an arrest. Here, law enforcement officers had called emergency medical technicians to come to the scene and help. I don't think that that case, Bird, would create some robust, again, consensus of authority that would have put Tim Lee or Mays on duty, but when they're called to provide assistance, that that makes them law enforcement officers. Throughout the, as Mr. Conrad had already pointed out, throughout the time that they were dealing with Mr. Longhorn, Tim Lee was telling Edwards that he was breathing, he got his stethoscope checked, he moved the pillow out of his face so that he would have an easier way to breathe. He actually performed CPR. He was not a law enforcement officer. And all of the cases cited, whether in the Fourth Circuit or outside the Fourth Circuit, have dealt with law enforcement officers, not emergency medical providers. Thank you. Thank you for your time. Thank you very much. We appreciate your arguments. And we will go directly to our next case.
judges: Diana Gribbon Motz, Robert B. King, Pamela A. Harris